**James LEMASTER, Petitioner,**

v.

**State of OHIO, et al., Respondents.**

**No. C–2–99–406.**

United States District Court,
S.D. Ohio,
Eastern Division.

Oct. 20, 2000.

Kevin Michael Schad, Cincinnati, OH, for Petitioner.

Laurence R. Snyder, Ohio Attorney General, Corrections Litigation Section, Cleveland, OH, for Respondents.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

Petitioner, a state prisoner, brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the instant petition, respondent's return of writ and the exhibits of the parties.

Petitioner and five other defendants were indicted by the October 1995 term of the Pickaway County grand jury on one count of engaging in a pattern of corrupt activity, in violation of O.R.C. § 2923.32(A)(1), twenty-six counts of receiving stolen property, in violation of O.R.C. § 2913.51, four counts of theft, in violation of O.R.C. § 2913.02, and two counts of vehicle identification number tampering, in violation of O.R.C. § 4549.62. Exhibit B to Return of Writ. Petitioner and a co-defendant were subsequently indicted by the February 2, 1996 term of the Pickaway County grand jury on one count of engaging in a pattern of corrupt activity, eight counts of receiving stolen property, one count of theft, one count of insurance fraud, and one count of aggravated arson. Exhibit D to Return of Writ. The indictments were consolidated (Exhibit P to Return of Writ), and on March 4, 1996, while represented by counsel, petitioner proceeded to jury trial. On March 14, 1996, petitioner was found guilty on eight counts of receiving stolen property, in violation of O.R.C. § 2913.51, one count of theft, in violation of O.R.C. § 2913.02 and one count of engaging in a pattern of corrupt activity, in violation of O.R.C. § 2923.32. (Petitioner was not convicted on four counts of receiving stolen property). Exhibit K to Return of Writ. Petitioner was sentenced on March 18, 1996, to nine terms of one year incarceration, to be served consecutively, and to one term of seven to twenty-five years incarceration, to be served concurrently. *State v. LeMaster*, Nos. 95CR–242, 96CR–19 (Pickaway Co. Com. Pleas, 1996), Exhibit L to Return of Writ.

Still represented by counsel, petitioner filed a motion for new trial with the trial court on March 15, 1996, which was denied on March 21, 1998. Exhibits M and O to Return of Writ. Petitioner, again represented by the same counsel, also filed a timely appeal of his convictions to the Fourth District Court of Appeals. Exhibit R to Return of Writ. Petitioner asserted the following assignments of error:

1. Did the trial court commit prejudicial error when it permitted the prosecutor, in his final closing, to read parts of a transcript verbatim and to comment upon it to the jury when the court had denied the jury the right to read the transcript and instead, an unintelligible tape recording was played?

2. Was prejudicial error committed when trial counsel was disqualified to the extent that he could not cross examine Anthony Moody?

3. Was Stephen Gussler incompetent in his cross-examination of Anthony Moody?

4. Was the failure to object to phone records plain error?

5. If not plain error, was James Kingsley incompetent because he failed to object at trial to exclude defendant's phone records?

6. Should the phone records have been suppressed because they were obtained by subpoena and not by search warrant?

7. Was the finding of guilty in Case No. 96CR–19, count 4, contrary to law and against the manifest weight of the evidence?

8. Did the predicate offenses merge into the RICO conviction?

9. Could predicate offenses stated in Case No. 96CR–19 be used in Case No. 95CR–242 and visa versa?

10. Was the defendant denied due process of law and a fair trial because jurors perjured themselves in voir dire by stating they did not know the defendant, or they were unaware of defendant's trucking business or defendant's prior arson trial for which he was acquitted?

11. Did the trial court impose maximum consecutive sentences only because the defendant exercised his right to a trial by jury?

12. Was the defendant denied a fair trial because of the failure of the State of Ohio to provide exculpatory evidence?

13. Was the verdict against the manifest weight of the evidence and contrary to law because the state failed to prove replacement value of the items stolen but instead relied upon purchase price?

14. Is O.R.C. § 2923.32 unconstitutional?

15. Did the court of appeals deny appellant due process of law when it denied his motion to enlarge his appellate brief?

Exhibit T to Return of Writ. On January 21, 1998, the appellate court affirmed the judgment of the trial court. *State v. LeMaster*, No. 96CA–18 (Pickaway Co.App. Ct.1998), Exhibit X to Return of Writ. Represented by new appellate counsel, petitioner filed an appeal of the appellate court's decision to the Ohio Supreme Court. Exhibit Y to Return of Writ. He asserted the following propositions of law:

1. The trial court denied the appellant his right to counsel when the court prohibited counsel from participating in the cross-examination of Anthony Moody, a critical State's witness.

2. The appellant was denied his right to effective assistance of counsel when substitute counsel cross-examined Anthony Moody.

3. The appellant was denied his right to a fair trial when the prosecutor, during closing argument, alluded to matters outside of the record.

4. The appellant's right to due process of law was violated when he was convicted under R.C. 2923.32, which is unconstitutionally vague for failing to set forth an ascertainable standard of guilt.

5. The appellant's right to due process of law was violated when the trial court failed to merge his predicate offenses into the § 2923.32 conviction.

Exhibit Z to Return of Writ. On April 22, 1998, the Ohio Supreme Court apparently denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question. Exhibit BB to Return of Writ.

Petitioner filed a petition for post conviction relief and motion for new trial with the trial court, still represented by counsel, in which he asserted the following claims:

1. Whether the petitioner should be granted a new trial based upon newly discovered evidence, wherein it was discovered that two key witnesses for the State lied under oath and violated the sequestration order, and the pervasiveness of prosecutorial misconduct during

the petitioner's trial which denied him of a fair trial and due process of law?

2. Whether the petitioner was denied his Sixth Amendment right to effective assistance of counsel by counsel's failure to present available evidence which would have refuted the State's case and for failing to timely file a motion for post-conviction relief.

3. Whether the petitioner's constitutional rights under the Fifth and Fourteenth Amendment have been violated by the excessive sentence?

4. Whether the petitioner is entitled to an evidentiary hearing on these matters?

Exhibits CC and DD to Return of Writ. On October 29, 1998, the trial court denied petitioner's motion. Exhibits FF and GG to Return of Writ. Again represented by counsel, petitioner filed an appeal of the trial court's decision to the Fourth District Court of Appeals, in which he asserted the same claims. Exhibits HH and II to Return of Writ. The appellate court affirmed the judgment of the trial court on September 28, 1999. Exhibit LL to Return of Writ. Petitioner filed an appeal of the appellate court's decision to the Ohio Supreme Court. He asserted the following claims:

1. Whether the appellant was denied his right to counsel.

2. Whether substitute counsel provided ineffective assistance.

3. Whether the prosecutor engaged in misconduct during closing argument.

4. Whether O.R.C. § 2923.32 is unconstitutionally vague.

Exhibits MM and NN to Return of Writ. On January 19, 2000, the Ohio Supreme Court dismissed the appeal as not involving any substantial constitutional question. Exhibit PP to Return of Writ.

Petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, represented by counsel, on April 23, 1999.[1] He alleges that he is in

the custody of the respondent in violation of the Constitution of the United States based upon the following:

1. Whether the petitioner was denied his right to counsel during trial.

2. Whether the prosecutor engaged in misconduct during closing arguments which denied the petitioner his right to fair trial.

3. Whether O.R.C. § 2923.32 is unconstitutionally vague.

4. Whether the petitioner is entitled to an evidentiary hearing on these matters.

Petitioner filed a supplemental memorandum in support of his petition on June 16, 2000, in which he alleges that he is in the custody of the respondent based upon the following additional grounds:

5. Newly discovered evidence requires reversal of the petitioner's convictions.

6. Counsel was ineffective during pretrial investigation.

7. The trial court erred in failing to recuse itself.

8. The petitioner's sentence was excessive in violation of the Eighth Amendment.

It is the position of the respondent that petitioner has committed a procedural default as to claims three, and seven, and to any claims that were initially raised in petitioner's post conviction action. Respondent also argues that petitioner's claims are without merit.

## I. PROCEDURAL DEFAULT

██ In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to fairly present those claims to the highest court of the state for consideration. 28 U.S.C. § 2254(b), (c). If he fails to do so,

---

1. The petition was held in abeyance, pursuant to petitioner's request, pending conclusion of state appellate review. *Order*, April 28, 1999.

but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982) (per curiam); *Picard v. Connor,* 404 U.S. 270, 275–76, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Murray v. Carrier,* 477 U.S. 478, 485, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Engle v. Isaac,* 456 U.S. 107, 129, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

■■ In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir.1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.* This "cause and prejudice" analysis also applies to failures to raise or preserve issues for review at the appellate level. *Leroy v. Marshall,* 757 F.2d 94 (6th Cir.),

*cert. denied,* 474 U.S. 831, 106 S.Ct. 99, 88 L.Ed.2d 80 (1985).

### A.

First, this Court must determine whether there are any state procedural rules applicable to petitioner's claims, and if so, whether petitioner violated the rule(s).

In petitioner's third claim for relief, he asserts that O.R.C. § 2923.32 is unconstitutionally vague. This claim, being readily apparent from the face of the record, would be properly raised on direct appeal. Petitioner raised the claim on direct appeal; however, he addressed the claim in the appendix of his appellate brief. Exhibit T to Return of Writ. The respondent argues that the claim was thus not properly presented to the state courts, as petitioner's appellate brief exceeded page limitations under state appellate court rules.

In petitioner's seventh claim for relief, he asserts that the trial court erred in failing to recuse itself. This claim also should have been raised on direct appeal, but was not. In fact, petitioner never presented claim seven to the state courts, and now may no longer do so under Ohio's doctrine of *res judicata. See State v. Cole,* 2 Ohio St.3d 112, 443 N.E.2d 169 (1982); *State v. Ishmail,* 67 Ohio St.2d 16, 423 N.E.2d 1068 (1981); *State v. Perry,* 10 Ohio St.2d 175, 226 N.E.2d 104 (1967).

Petitioner's second, fifth, sixth and eighth claims for relief were first raised in a post conviction action filed with the trial court on September 2, 1998. Respondent argues that petitioner has committed a procedural default as to all of these claims because the trial court found that petitioner had failed to timely file his post conviction action under Ohio law. Exhibit GG to Return of Writ.

### B.

■ Next, this Court must determine whether or not the state relied upon the procedural rule(s) to dispose of the claims. The state appellate court did not address

petitioner's third claim for relief, or any of the seven claims that petitioner raised in the appendix of his appellate brief. This Court presumes that the appellate court refused to consider these claims because petitioner's appellate brief exceeded the page limitations under Ohio law or because petitioner otherwise failed to comply with the Ohio Rules of Appellate Procedure.[2] However, the appellate court decision in this case does not indicate why claims raised in the appendix of petitioner's appellate brief were not addressed, and this Court is unable to determine from the documents which have been made a part of the record before this Court, the basis for the appellate court's refusal to consider such claims. In *Harris v. Reed,* 489 U.S. 255, 265–66, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), the Supreme Court held that a procedural default will not preclude consideration of a federal claim in federal habeas corpus unless the last state court rendering judgment in the case clearly and expressly stated that its judgment rested on that procedural bar. Because the state appellate court did not clearly and expressly indicate in the decision which has been made a part of the record before this Court the reasons for its refusal to address claims raised in the appendix of petitioner's appellate brief, the Court will consider the merits of petitioner's claim three. (*See Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)) ("The essence of unexplained orders is that they say nothing.")

As to petitioner's seventh claim for relief, which was never presented to the state courts for review, the state courts were not given an opportunity to enforce the procedural rule due to the nature of petitioner's procedural default.

■■■■ As to petitioner's second, fifth, sixth and eighth claims for relief, these claims were first presented in a post conviction action filed in the trial court. The trial court noted that the action had not

been timely filed under Ohio law, *see* Exhibit FF to Return of Writ, but nonetheless proceeded to consider the merits of petitioner's claims. Exhibits FF and GG to Return of Writ. State courts can reach the merits of a federal claim without sacrificing the procedural default, so long as the merits review is expressed as an alternative holding. *Harris v. Reed, supra,* 489 U.S. 255 at 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308. Further, in order to determine whether the state courts clearly and expressly relied on a state procedural default, this Court must look to the last state court disposition providing reasons for its decision. *Couch v. Jabe,* 951 F.2d 94, 96 (6th Cir.1991), citing *Ylst v. Nunnemaker, supra.* "[W]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground. If an earlier opinion 'fairly appear[s] to rest primarily upon federal law,' [Coleman ] we will presume that no procedural default has been invoked by a subsequent unexplained order that leaves the judgment or its consequences in place." *Id.,* at 96, citing *Ylst v. Nunnemaker, supra* and *Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). In the instant case, the last state court to address petitioner's claims was the Fourth District Court of Appeals, which considered the claims presented in petitioner's post conviction action on the merits. Exhibit LL to Return of Writ. The Court will therefore address the merits of petitioner's second, fifth, sixth and eighth claims for relief.

C.

■■■ Third, it is for the Court to decide whether the procedural rules at issue constitute adequate and independent bases upon which to foreclose review of the petitioner's federal constitutional claims. This

---

2. Petitioner argued, in his fifteenth claim on direct appeal, not addressed by the appellate court, that petitioner had been denied due

process by the appellate court's denial of petitioner's request to enlarge his appellate brief. *See* Exhibit T to Return of Writ.

task requires the Court to balance the state's interests behind each procedural rule against the federal interest in reviewing federal claims. *See Maupin v. Smith,* 785 F.2d at 138.

■ Under this analysis, the procedural rules barring petitioner's claims for relief constitute adequate and independent state grounds for denying relief. The state courts must be given an full and fair opportunity to remedy alleged constitutional defects. The requirement that all available claims be asserted in the first appeal serves the state's interests in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. Finally, the doctrine of *res judicata* is state in unmistakable terms in numerous Ohio decisions and Ohio courts have consistently refused to review claims on the merits under that doctrine. *See State v. Cole, supra; State v. Ishmail, supra; State v. Perry, supra.*

### D.

This Court concludes that petitioner waived his right to present his seventh claim for federal habeas review. Petitioner can still secure review of his claim on the merits if he demonstrates cause for his failure to follow the state procedural rules, as well as actual prejudice from the constitutional violations that he alleges. Petitioner has failed to demonstrate either cause for his procedural default or actual prejudice resulting from the alleged constitutional violation.

### E.

■ Beyond the four-part *Maupin* analysis, this Court is required to consider whether this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier,* 477 U.S. at 491, 106 S.Ct. 2639; *see also Sawyer v. Whitley,* 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269. After review of the record, the Court does not deem this to be such a case.

### II. CLAIM ONE

In his first claim for relief, petitioner asserts that he was denied his right to counsel due to the trial court's order disqualifying petitioner's retained attorney from cross-examining Anthony Moody, trial counsel's former client and a prosecution witness against petitioner, during trial. Petitioner asserts as follows:

> ... [Petitioner] retain[ed] James Kingsley as his trial counsel. Prior to trial, the prosecution moved to dismiss Kingsley from trial, due to the fact that Kingsley had represented two potential state witnesses. One of those witnesses, Anthony Moody, was one of the key witnesses for the prosecution. The trial court, instead of dismissing Kingsley from the case, instead held that Kingsley could not cross-examine Moody. The court appointed new counsel to come in and handle the Moody cross-examination. This new counsel was not present during the balance of the trial. Further, appointed counsel was not allowed to discuss the case with Kingsley.

*Petition.* Petitioner also asserts the ineffective assistance of counsel due to the trial court's ruling. Petitioner argues that his attorney, Kingsley, was unprepared because he did not have access to part of the trial and that the trial court should have appointed new counsel to conduct the entire trial rather than new counsel only for cross-examination of Moody. *Id.*

The state appellate court made the following relevant findings regarding petitioner's claim:

> On December 18, 1995, appellee filed a motion to disqualify James Kingsley from representing appellant at trial. In a memorandum in support of the motion, appellee argued that an actual conflict of interest existed because Kingsley represented one of the grand jury witnesses, James Vanover, during Vanover's grand jury testimony concerning counts two, twenty-two, and thirty-one of the December 8, 1995 indictment. Appellee further argued that a potential conflict

of interest existed because: (1) Kingsley had represented appellant's co-defendant Anthony Moody at the December 12, 1995 arraignment; (2) appellee intends "to make plea offers to each individual defendant in this case that would involve that defendant testifying against his co-defendants"; (3) if co-defendant Anthony Moody chooses to accept a plea offer, Kingsley will not be able to represent appellant because continued representation would require Kingsley to cross-examine his client, Anthony Moody, during appellant's trial.

In a supplemental memorandum filed on January 19, 1996, appellee noted that Anthony Moody signed a plea agreement in which he agreed to testify against appellant. Appellee further noted that Anthony Moody had signed an affidavit in which he asserted his attorney-client privilege and joined in appellee's motion to disqualify Kingsley from representing appellant.

On January 19, 1996, appellant filed a memorandum against appellee's motion to disqualify Kingsley. In the memorandum, Kingsley explained details concerning his representation of the two defendants and raised various arguments including the following: (1) Anthony Moody lacks standing to move to disqualify Kingsley; (2) an attorney may cross-examine a former client using unprivileged information; (3) Kingsley has no privileged information with which to cross-examine Anthony Moody; (4) the fact that Anthony Moody has volunteered to testify waives any claim of privilege he may have; and (5) appellant has waived any potential conflict of interest that may arise.

Additionally, appellant contended that any disqualification of Kingsley would constitute a final appealable order.

On January 30, 1996, the trial court permitted Kingsley to represent appellant during all parts of the trial except the cross-examination of Anthony Moody. The trial court ordered that Kingsley take no part in the cross-examination of Anthony Moody.

On February 2, 1996, the Pickaway County Grand Jury indicted appellant and one other person on one count of engaging in a pattern of corrupt activity, eight counts of receiving stolen property, one count of theft, one count of insurance fraud, and one count of aggravated arson. Also on February 2, 1996, appellee moved to consolidate the two indictments and schedule both for trial on March 4, 1996.

On February 15, 1996, the trial court granted the motion to consolidate and ordered the trial of both cases to begin on March 4, 1996.

\* \* \* \* \* \*

On March 4, 1996, the trial court commenced a jury trial of fourteen counts against appellant. On March 14, 1996, the jury found appellant guilty of the following eight counts of receiving stolen property, one count of theft, and one count of engaging in a pattern of corrupt activity[.]

\* \* \* \* \* \*

[A]ppellant asserts that the trial court erred by disqualifying his trial counsel, James Kingsley, from cross-examining Anthony Moody. Appellant makes many arguments in support of this assignment of error including the following: (1) Kingsley had a trial strategy of destroying Anthony Moody's credibility, thus making his accusations against appellant incredible; (2) although Kingsley had represented both appellant and Anthony Moody in the past, Kingsley had informed both men that if a conflict of interest arose between them, Kingsley could not continue to represent Anthony Moody; (3) Kingsley never had an opportunity to discuss the facts of the indictments in the case *sub judice* with Anthony Moody; (4) Kingsley wished to impeach Anthony Moody by confronting Anthony Moody with his prior statement wherein he asserted that appellant was not involved with the arson, the insurance scam, or any other criminal activi-

ty; (5) because Anthony Moody made the above statement in the presence of a third person, appellant, it is not subject to the attorney/client privilege; (6) the Sixth Amendment right to counsel belongs to the accused and not to a witness in the case; and (7) because Anthony Moody testified, he waived any claim of privilege.

We agree with appellant that Anthony Moody's testimony constituted a large part of the state's case against appellant. As part of a plea agreement, Anthony Moody pleaded guilty to one count of engaging in corrupt activity and to twenty-five counts of receiving stolen property, and he agreed to testify against appellant. Anthony Moody testified that he stole "quite a few things" on an ongoing basis with appellant and others including a bulldozer, a backhoe, a bobcat, a tractor, and a trailer. Anthony Moody gave details concerning many of the thefts listed in the indictments.

We note, however, that Anthony Moody's testimony was not the only testimony linking appellant to the crimes listed in the indictments. Other witnesses corroborated Anthony Moody's testimony. Kenneth Moody testified that he and appellant had an ongoing relationship involving stolen bulldozers, backhoes, and bobcats. Kenneth Moody detailed both appellant's and Anthony Moody's involvement in the criminal activity.

Pickaway County Deputy Sheriff Rex Emrick testified that appellant approached him "to make some type of a deal." During their conversation, appellant admitted that "he knew of a lot of stolen stuff out there and a lot of other people that are involved in this, that there was as much property as if you would line it up end to end it would circle the earth." When Deputy Emrick told appellant that any deal would involve prison time, appellant said, "I will just have to fight you to the end." John Stires testified that he helped appellant sell and hide stolen property.

Additionally, we note that on cross-examination, Anthony Moody admitted that he doesn't recall all the details and dates of the thefts. He further admitted that prior to his recent religious conversion, he was a habitual liar. He also testified that he used appellant's garage to hide stolen items without appellant's knowledge and that he placed calls from appellant's telephone during the time he was having an extra-marital affair with appellant's daughter.

We must determine whether the trial court erred by disqualifying Kingsley from cross-examining Anthony Moody. We note that both defense counsel and the trial court must ensure that a defendant's legal representation is free from conflicts. *State v. Dillon* (1995), 74 Ohio St.3d 166, 167, 657 N.E.2d 273, 275. In *State ex rel. Keenan v. Calabrese* (1994), 69 Ohio St.3d 176, 180, 631 N.E.2d 119, 122, the court noted that an appellate court must apply an abuse of discretion standard of review in counsel disqualification cases:

"Additionally, as appellant concedes, the standard of review for determining whether the court erred in its pretrial disqualification of defense counsel is whether it abused its broad discretion." In *State v. Montgomery* (1991), 61 Ohio St.3d 410, 413, 575 N.E.2d 167, 171, the court followed established law on what constitutes an abuse of discretion:

"The term 'abuse of discretion' ' * * * connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. * * *' *State v. Adams* (1980), 62 Ohio St.2d 151[ 404 N.E.2d 144] * * *."

*See, also, State v. Xie* (1992), 62 Ohio St.3d 521, 584 N.E.2d 715, and *State v. Moreland* (1990), 50 Ohio St.3d 58, 552 N.E.2d 894. Accordingly, we must determine whether the trial court's decision disqualifying Kingsley from cross-examining Anthony Moody was unreasonable, arbitrary, or unconscionable. We have reviewed the record below and

766

find no abuse of discretion with the trial court's decision to disqualify Kingsley from cross-examining Anthony Moody. Appellant does not dispute the fact that Kingsley represented both appellant and Anthony Moody in proceedings related to the indictments in the case *sub judice.* Appellant also does not dispute the fact that Anthony Moody entered into a plea agreement that involved him testifying against appellant. These facts alone support the trial court's decision disqualifying Kingsley from cross-examining Anthony Moody.

Additionally, we note that the majority of the arguments appellant raises in this assignment of error involve facts outside of the record transmitted on appeal. We have no evidence concerning the exact communications between Kingsley and appellant, or concerning any legal representation disclaimers that Kingsley might have made to Anthony Moody. We have no evidence of whether Kingsley ever discussed the facts of the indictments in the case sub judice with Anthony Moody, or whether Anthony Moody made certain statements to Kingsley in the presence of third parties.

Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error.

In his third assignment of error, appellant asserts that he received ineffective assistance of counsel because Steven Gussler, acting temporarily as appellant's trial counsel, failed to effectively cross-examine Anthony Moody.

In *State v. Smith* (1985), 17 Ohio St.3d 98, 100, 477 N.E.2d 1128, 1131, the court followed the two-prong analysis announced in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, for resolving claims of ineffective assistance of counsel[.]

\* \* \* \* \* \*

We have reviewed the record of the proceedings below and find that Stephen Gussler's cross-examination of Anthony Moody did not constitute a serious error which deprived appellant of a fair trial.

Although appellant claims that Gussler failed to cross-examine Anthony Moody regarding telephone calls he made from appellant's residence, we find that Gussler did cross-examine Anthony Moody in this regard. Anthony Moody admitted that he had access to appellant's telephone and made calls from appellant's telephone.

Although appellant argues that Gussler should have asked more specific questions regarding the exact calls Anthony Moody placed from appellant's telephone, Gussler's decision not to ask more specific questions might have been considered sound trial strategy. Gussler obtained a wealth of testimony from Anthony Moody during cross-examination. When Gussler asked Anthony Moody about many detailed facts surrounding the crimes, Anthony Moody admitted that he could not recall all of the details. Anthony Moody further admitted that prior to his recent religious conversion, he was a habitual liar. Anthony Moody testified that he used appellant's garage to hide stolen items without appellant's knowledge. Anthony Moody also testified that he placed calls from appellant's telephone during the time he was having an extra-marital affair with appellant's daughter. Due to the success of the questions Gussler posed on cross-examination, he may have decided, as a trial strategy, not to ask questions that had a slim chance of aiding appellant's case.

Appellant additionally complains that the trial court's "Chinese Wall" order prohibiting Kingsley from communicating with Gussler during his cross-examination of Anthony Moody, deprived appellant of his Sixth Amendment right to effective assistance of counsel. As we discussed above, we find no ineffective assistance of counsel regarding Gussler's cross-examination of Anthony Moody. For that reason, we find appellant suffered no prejudicial error from the trial court's order prohibiting Kingsley from communicating with Gussler during the cross-examination.

*State v. Lemaster,* No. 96CA–18, 1998 WL 27937 (Pickaway Co.App.Ct.1998), Exhibit X to Return of Writ.

The Court first notes that petitioner's claim that he was denied the right to counsel due to the trial court's order disqualifying Kinglsey from cross-examining Moody during trial was not presented to the state appellate court. It therefore appears that petitioner has committed a procedural default as to this portion of his claim. Also, petitioner's claim that the trial court should have appointed new counsel to represent petitioner during the entire trial rather than solely for purposes of cross-examination of Moody, was never presented to the state courts. Petitioner never requested new counsel to be appointed. Respondent, however, did not raise these aspects of procedural default, and procedural default is an affirmative defense. *Trest v. Cain,* 522 U.S. 87, 118 S.Ct. 478, 139 L.Ed.2d 444 (1997); *Gray v. Netherland,* 518 U.S. 152, 165, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996). The Court will therefore consider the merits of petitioner's claim.

■■■■ The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the assistance of counsel for his defense. This guarantee includes the right to have counsel, the right to a minimum quality of counsel, the right to have a reasonable opportunity to select and be represented by chosen counsel, and the right to preparation period sufficient to assure minimum quality counsel. *Wilson v. Mintzes,* 761 F.2d 275, 278 (6th Cir.1985), citing *Birt v. Montgomery,* 725 F.2d 587, 592 (11th Cir. 1984) (en banc). An accused who desires to and is financially able "should be afforded a fair opportunity to secure counsel of his own choice." *Powell v. Alabama,* 287 U.S. 45, 53, 53 S.Ct. 55, 77 L.Ed. 158 (1932). When a court unreasonably or arbitrarily denies a defendant counsel of choice, such denial can rise to the level of a constitutional violation. *Wilson v. Mintzes, supra,* citing *Birt v. Montgom-*

*ery, supra; United States v. James,* 708 F.2d 40, 44 (2nd Cir.1983); *see Glasser v. United States,* 315 U.S. 60, 70, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Faretta v. California,* 422 U.S. 806, 820–21, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *Linton v. Perini,* 656 F.2d 207, 208–9 (6th Cir.1981), *cert. denied,* 454 U.S. 1162, 102 S.Ct. 1036, 71 L.Ed.2d 318 (1982). However, a defendant's right to counsel of choice is not absolute. *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988); *Serra v. Michigan Department of Corrections,* 4 F.3d 1348 (6th Cir.1993).

> The trial court "must recognize a presumption in favor of [a defendant's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court." [*Wheat v. United States, supra,*] at 164, 108 S.Ct. at 1700.

*Id.,* at 1351. When presented with a government's motion for disqualification of an attorney, the court must balance the "constitutional right of the defendant to representation by counsel of his choosing with the court's interest in the integrity of its proceedings and the public's interest in the proper administration of justice." *United States v. Reese,* 699 F.2d 803 (6th Cir. 1983); *see also Wheat v. United States, supra,* 486 U.S. at 157, 108 S.Ct. 1692.

■■ In the instant case, as noted by the state appellate court, petitioner's retained counsel, Kinglsey, represented petitioner's co-defendant, Moody, prior to petitioner's trial, and presumably gained confidential information from Moody during that time. Kingsley would have been required to cross-examine Moody during trial, whose testimony comprised a significant part of the state's case against petitioner; Moody had signed a plea agreement agreeing to testify against petitioner. Moody asserted his attorney-client privilege and joined the government's request to disqualify Kingsley from representing

petitioner. *See* Exhibit X to Return of Writ. Under these circumstances, petitioner was not denied his right to counsel by the trial court's order disqualifying Kingsley from cross-examining his former client.

> [W]hen a trial court finds an actual conflict of interest which impairs the ability of a criminal defendant's chosen counsel to conform with the ABA Code of Professional Responsibility, the court should not be required to tolerate an inadequate representation of a defendant. Such representation not only constitutes a breach of professional ethics and invites disrespect for the integrity of the court, but it is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver [of conflict] or the fairness of the proceedings in his own court and the subtle problems implicating the defendant's comprehension of the waiver.

*Wheat v. United States, supra*, 486 U.S. at 162, 108 S.Ct. 1692.

> The trial court "must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses."

*Serra v. Michigan Department of Corrections, supra,* citing *Wheat v. United States, supra*, 486 U.S. at 163, 108 S.Ct. 1692.

■ The right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel. *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel's performance was deficient.

This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington, supra,* 466 U.S. at 687, 104 S.Ct. 2052; *see also Blackburn v. Foltz,* 828 F.2d 1177 (6th Cir.1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* at 689, 104·S.Ct. 2052.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Strickland,* at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance, if the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Id.* at 697, 104 S.Ct. 2052. The state court's findings are entitled to a presumption of correctness, 28 U.S.C. § 2254(d), (e), and upon review of the record, this Court finds no reason to disturb those findings here. Petitioner has failed to establish that his retained counsel or the counsel appointed for the cross-examination of Moody was ineffective under the test set forth in *Strickland.*[3] Petitioner's claim is without merit.

---

3. As noted by the appellate court, review of the record does not reveal any prejudice from the trial court's decision to disqualify Kingsley only from cross-examination of Moody rather than completely disqualifying Kingsley from representation of petitioner at trial. As previously noted, petitioner never requested

## III. CLAIM TWO

In his second claim for relief, petitioner asserts that he was denied due process because the prosecutor improperly read to the jury during closing argument from a transcript which had been excluded from evidence by the trial court.

The state appellate court made the following findings regarding petitioner's claim:

In his first assignment of error, appellant asserts that the trial court erred by permitting the prosecutor, in his final closing argument, to read parts of an unofficial transcript of a surreptitious April 12, 1995 tape recording of a conversation between appellant and Jay Moody.

During the trial, Pickaway County Sheriff's Office Detective Gary Combs testified that as a part of a multi-county investigation into the theft of heavy equipment in Ohio, he placed a body wire on Jay Moody, which was used to surreptitiously record the conversation between appellant and Jay Moody, and then arranged for an unofficial transcript of that tape recording to be prepared. Detective Combs further testified that the unofficial transcript was a true and accurate recording of the conversation he heard transmitted by the body wire.

Before permitting appellee to play the tape recording to the jury, the trial court told the jury that "you will have a transcript as you listen along on this tape." The trial court then recessed for twenty minutes. After the recess, the trial court asked appellant's attorney if he had any objection to the playing of the tape recording. Appellant's attorney answered, "Except as noted in the record, your Honor, no." We note that the trial transcript does not include any objection by appellant to the playing of the tape recording. We further note that although appellant contends on appeal that the trial court "had denied the jury the right to read the [unofficial] transcript" of the tape recorded conversation, the trial transcript does not indicate that the trial court departed from its earlier statement to the jurors—"you will have a transcript as you listen along on this tape"—and withheld copies of the unofficial transcript from jurors.

Appellant contends that the tape recording was unintelligible. The trial transcript, however, includes no objection from appellant regarding the quality of the tape recording. Although the trial transcript indicates that a bench conference occurred shortly before the twenty minute recess and again sometime after the jury began listening to the tape recording, the trial transcript does not include what transpired during those bench conferences. Post-trial proceedings, however, shed light on what transpired during those bench conferences. On March 15, 1996, appellant filed a motion for a new trial addressing the fact that during closing argument, appellee read portions of the unofficial transcript to the jury. Appellant claimed that appellee's unofficial transcript of the conversation materially varied from appellant's unofficial transcript of the same conversation. Appellant further

---

that the trial court completely disqualify Kingsley from representing petitioner at trial. [T]rial courts confronted with multiple representations face the prospect of being "whip-sawed" by assertions of error no matter which way they rule. If a ... court agrees to the multiple representation, and the advocacy of counsel is thereafter impaired as a result, the defendant may well claim that he did not receive effective assistance. *See, e.g., Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). On the other hand, a district court's refusal

to accede to the multiple representation may result in a challenge such as petitioner's in this case. Nor does a waiver by the defendant necessarily solve the problem, for we note, without passing judgment on, the apparent willingness of the Court of Appeals to entertain ineffective-assistance claims from defendants who have specifically waived the right to conflict-free counsel. [Citations omitted].

*Wheat v. United States, supra,* 486 U.S. at 161, 108 S.Ct. 1692.

claimed that appellee's reading of appellee's unofficial transcript "went beyond the evidence" presented at trial.

On March 21, 1996, the trial court issued a decision on appellant's motion for a new trial. After recalling what occurred during the bench conferences and comparing the unofficial transcripts with each other, the trial court wrote, in pertinent part, as follows:

" * * * A transcript of the tape[ ] was prepared by the State. However, the jury was not permitted to have access to the State's transcript. The Court indicated to both counsel that it would permit the jury to read a written transcript while listening to the taped conversation provided the parties were in agreement with respect to what the transcript said. Due to the fact that defense counsel objected to the jury having any written transcript to [sic] read from, the Court denied the jury access to any written transcript and simply permitted them to listen to the taped conversation. * * * Defense counsel argues that the State's transcript materially varied from the defendant's transcription. The Court was willing, however, to submit both the defense transcript and the State's transcript to the jury for its consideration with respect to what was said on the tape. Again, however, defense counsel objected to any written transcripts being submitted to the jury.

Defendant argues that the undercover tape was 'totally unintelligible for 1.5 hours.' The Court disagrees with defense counsel with respect to this argument. In fact, defense counsel should be reminded that part of the tape was redacted at the request of defense counsel due to the fact that defendant is heard commenting that he sold 'hot parts' to a man who is now Sheriff in Kentucky. The Court granted defendant's motion to redact this part of the recording due to its prejudicial effect upon the defendant. This part of the recording is reflected in defendant's own transcript at Page 9 of defendant's motion for new trial Exhibit B1A. If de-

fense counsel honestly believed that the jury could not hear any of the 1.5 hours of tape, then why did he move the Court to redact this inflammatory part? The answer is simple. The jury could hear the tape.

Defense counsel argues that a prosecutor has a duty in closing argument not to go beyond the evidence before the jury. *State v. Smith* (1984), 14 Ohio St.3d 13, 470 N.E.2d 883. Additionally, the defense counsel cites the case of *People v. Shaw*, 150 A.D.2d 626, 541 N.Y.S.2d 495 (1989) for his contention that where a prosecutor in closing arguments inaccurately [emphasis sic] attributes to an undercover officer a more complete description of the perpetrator that the officer gave in his testimony, the court should· give a curative instruction to the jury.

This Court does not disagree with the propositions of law espoused in defendant's motion for new trial. However, this Court is of the opinion that the argument made by Prosecutor Smith accurately reflects the conversations which the jury heard on the undercover tape. For example, Prosecutor Smith argued that defendant can be heard discussing the fact that thirty-seven pieces of equipment had been confiscated and were stored at the Ross County Fairgrounds. This is exactly what both transcripts show. * * *

* * * * * *

This Court also compared other parts of Smith's closing to both transcripts as prepared by the State and defense. * * *

The State's transcript is again remarkably similar to the version transcribed by the defense. * * *

The Court is of the opinion that Prosecutor Smith's comments with respect to the contents of the undercover tape were reasonable and therefore not tantamount to prosecutorial misconduct. The jury was instructed to rely on its collective memory and notes in recalling

the evidence. In that the comments of Prosecutor Smith were in line with the words spoken by the defendant on the tape, the Court is of the opinion that closing argument was well within the bounds of fair comment allowed in closing argument. Additionally, as counsel will recall, the Court instructed the jury that closing arguments are not evidence."

We agree with the trial court's assessment of the arguments appellant raises in this assignment of error. After reviewing the tape recording, we decline to characterize it as "totally unintelligible." Although many portions of the tape are difficult to hear, the tape is sufficiently intelligible to be introduced as evidence at trial. After reviewing both unofficial transcripts of the tape recording, we decline to characterize them as inaccurate. Although many discrepancies exist, no substantive discrepancies exist between the portions of appellee's unofficial transcript read during closing argument and the same portions of appellant's unofficial transcript. The portions that appellee read to the jury during closing arguments are substantively the same in both unofficial transcripts.

Appellant cites *State v. Soke* (1995), 105 Ohio App.3d 226, 663 N.E.2d 986, for the proposition that before a defendant may use an unofficial transcript of a tape recording for impeachment purposes, the defendant "must first obtain prior approval of the court if the accuracy of the transcripts is challenged." We can distinguish *Soke* from the case *sub judice* in two respects. First, *Soke* involves transcripts used for impeachment purposes. In the case *sub judice*, appellee did not attempt to use the transcript of the conversation between appellant and Jay Moody for impeachment purposes. Second, neither the tape recording nor the transcript in *Soke* had been authenticated when offered into evidence.

In the case *sub judice*, appellee elicited testimony from Detective Combs that both the tape recording and appellee's unofficial transcript of the tape recording were true and accurate reproductions of the conversation he heard between appellant and Jay Moody.

Additionally we note that the trial court thrice instructed the jury that closing arguments are not evidence. We find no reason to believe the jury departed from the trial court's instructions.

Assuming, arguendo, appellee's reading from portions of the unofficial transcript during closing argument was improper, we would find no reversible error. The effect of counsel's misconduct must be considered in light of the whole record. *See State v. Durr* (1991), 58 Ohio St.3d 86, 94, 568 N.E.2d 674, 683, *certiorari denied*, 502 U.S. 912, 112 S.Ct. 310, 116 L.Ed.2d 252; *State v. Maurer* (1984), 15 Ohio St.3d 239, 266, 473 N.E.2d 768, 792–93, *certiorari denied* (1985), 472 U.S. 1012, 105 S.Ct. 2714, 86 L.Ed.2d 728; *State v. Jackson* (June 13, 1991), Jackson App. No. 633, 1991 WL 110221, unreported. In *Maurer*, 15 Ohio St.3d at 269, 473 N.E.2d at 794–795, the court held that prosecutors must be given wide latitude during closing argument. *See, also, State v. Eley* (1996), 77 Ohio St.3d 174, 187, 672 N.E.2d 640, 652. Unless a prosecutor's misconduct prejudicially affected the defendant's substantial rights, the prosecutor's misconduct does not constitute reversible error. *See State v. Taylor* (1997), 78 Ohio St.3d 15, 28, 676 N.E.2d 82, 95; *Eley*, 77 Ohio St.3d at 187, 672 N.E.2d at 652; *State v. Smith [McMonagle]* (1984), 12 Ohio St.3d 15, 465 N.E.2d 382.

In the case *sub judice*, it is clear beyond a reasonable doubt that absent appellee's reading from portions of the unofficial transcript, appellant would still have been found guilty. When the evidence presented at trial is taken as a whole, appellee's reading from the unofficial transcript, even if error, would constitute merely harmless error.

*State v. Lemaster*, No. 96CA–18, 1998 WL 27937 (Pickaway Co.App.Ct.1998), Exhibit X to Return of Writ.[4]

4. The trial court held as follows, regarding petitioner's claim:

The scope of federal habeas corpus review of a claim of prosecutorial misconduct is narrow. A federal court does not sit as an appellate court employing supervisory powers to rectify ordinary trial error in cases before it for habeas review. *Donnelly v. De Christoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Rather, the Court must consider only whether the prosecutor's conduct was so egregious as to deny the petitioner fundamental fairness. *Id.* at 642–43, 94 S.Ct.

[T]he State of Ohio played for the jury two tapes of a conversation between Joe Moody, Jr. and the defendant that occurred on April 12, 1995. These tapes were submitted as State's Exhibits 35 A and B. A transcript of the tapes was prepared by the State. However, the jury was not permitted to have access to the State's transcript. The Court indicated to both counsel that it would permit the jury to read a written transcript while listening to the taped conversation provided the parties were in agreement with respect to what the transcript said. Due to the fact that defense counsel objected to the jury having any written transcript to [sic] read from, the Court denied the jury access to any written transcript and simply permitted them to listen to the taped conversation.

On closing argument, brief portions of the State's interpretation of the contents of the tapes were stated to the jury by Special Prosecutor Robert Smith. Defense counsel objected to Smith's argument to the jury concerning the content of the undercover tape. The Court overruled defendant's motion for mistrial and found that Smith's comments were proper argument. with respect to what the tape recorded.

Defense counsel argues that the State's transcript materially varied from defendant's transcription. The Court was willing, however, to submit both the defense transcript and the State's transcript to the jury for its consideration with respect to what was said on the tape. Again, however, defense counsel objected to *any* written transcripts being submitted to the jury.

Defendant argues that the undercover tape was "totally unintelligible for 1.5 hours." The Court disagrees with defense counsel with respect to this argument. . . .

[T]his court is of the opinion that the argument made by Prosecutor Smith accurately reflects the conversations which the jury heard on the undercover tape. For example, Prosecutor Smith argued that defendant can be heard discussing the fact that thirty-seven pieces of equipment had been confiscated and were stored at the Ross County Fairgrounds. This is exactly what both transcripts show.

\* \* \* \* \* \*

Where did Prosecutor Smith inaccurately quote from the undercover tape during his closing? Certainly not from the above-quoted section. Damaging? Yes. Inaccurate? Hardly.

This Court also compared other parts of Smith's closing to both transcripts as prepared by the State and defense. Specifically, starting at page 16 of defendant's Exhibit B1B, the following quote is attributable to Lemaster by his own counsel concerning the dumping of a Bobact:

"LEMASTER: Yeah. See that's it but it's gone. Fucker's is history buddy. That one mother fucker (inaudible) in the fuckin' cow pasture take them fuckin' every farm (inaudible). I dropped one of in one road and waited in the other road and dropped the other off. Long over the hill and covered 'em up. (Inaudible) woods, old mountains and everywhere else. (Inaudible) The only way they ever find that son-of-a-bitch is if somebody fuckin' be there. The only way they'd ever find it."

The State's transcript is again remarkably similar to the version transcribed by the defense. Specifically at page 24 of defendant's "Exhibit A", the State transcribes the conversation as follows:

"JIM: Yeah that's it but it's gone. The fuckers history buddy. The one mother fucker's just out there so fer [sic] in the fuckin' cow path that it will take them fuckers forever to find it now."
JAY: (Laughter)
JIM: "And blank I dropped one off on one road and one on the way on the other road and dropped the other one off and way over on the other and dropped the other. . .
JAY: (Laughter)
JIM: (Inaudible) Covered . . . . . .
JAY: (Laughter—static)
JIM: (Inaudible) thick woods, over mountains and everywhere else. It's history. The only way they'll ever find that son-of-a-bitch is if somebody will be . . . . . ."

. . . In that the comments of Prosecutor Smith were in line with words spoken by the defendant on the tape, the Court is of the opinion that the closing argument was well within the bounds of fair comment allowed in closing argument. . . .

Exhibit O to Return of Writ.

1868; *Martin v. Foltz*, 773 F.2d 711, 716–17 (6th Cir.1985), *cert. denied*, 478 U.S. 1021, 106 S.Ct. 3336, 92 L.Ed.2d 741 (1986); *Angel v. Overberg*, 682 F.2d 605, 607 (6th Cir.1982) (*en banc* ). This determination is made by evaluating the totality of the circumstances surrounding the case. *Angel v. Overberg*, 682 F.2d at 607.

▮ Again, the state court findings in this case are entitled to a presumption of correctness. 28 U.S.C. § 2254(d), (e). Upon review of the entire record before this Court,[5] the Court concludes that the prosecutor's comments regarding the tape recordings did not deprive petitioner of a fair trial. Contrary to petitioner's arguments, such evidence was admitted at trial when the tape recordings were played for the jury regardless of the fact that transcriptions of the tape recordings were not given to the jury, due to objections from defense counsel. The prosecutor's comments regarding the contents of tape recordings (Transcript, pp. 1415–1418, Exhibit QQ to Return of Writ) were thus within the bounds of permissible comments on the evidence. Petitioner's second claim for relief is without merit.

## IV. CLAIM THREE

In his third claim for relief, petitioner argues that O.R.C. § 2923.32 [6] is unconstitutionally vague because it contains no provision as to the culpable mental state required for violation of the offense. Petitioner also argues that the Ohio Supreme Court's decision in *Ohio v. Schlosser*, 79 Ohio St.3d 329, 681 N.E.2d 911 (1997), which held that O.R.C. § 2923.32 is a strict liability offense, is in violation of the Due Process Clause of the Constitution.

▮ The fair warning requirement of the Due Process Clause prohibits an individual from being held "criminally responsible for conduct which he could not reasonably understand to be proscribed." *Rose v. Locke*, 423 U.S. 48, 49, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975), citing *United*

5. The Court notes that the tape recordings and the transcripts of the tape recordings have not been made a part of the record before this Court.

6. O.R.C. § 2923.32 provides in relevant part as follows:
 (A)(1) No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt.
 (2) No person, through a pattern of corrupt activity or the collection of an unlawful debt, shall acquire or maintain, directly or indirectly, any interest in, or control of, any enterprise or real property.
 (3) No person, who knowingly has received any proceeds derived, directly or indirectly, from a pattern of corrupt activity or the collection of any unlawful debt, shall use or invest, directly or indirectly, any part of those proceeds, or any proceeds derived from the use or investment of any of those proceeds, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise.
 \* \* \* \* \* \*
 (B)(1) Whoever violates this section is guilty of engaging in a pattern of corrupt activity. Except as otherwise provided in this division, engaging in corrupt activity is a felony of the second degree. If at least one of the incidents of corrupt activity is a felony of the first, second, or third degree, aggravated murder, or murder, if at least one of the incidents was a felony under the law of this state that was committed prior to the effective date of this amendment and that would constitute a felony of the first, second, or third degree, aggravated murder, or murder if committed on or after the effective date of this amendment, or if at least one of the incidents of corrupt activity is a felony under the law of the United States or of another state that, if committed in this state on or after the effective date of this amendment, would constitute a felony of the first, second, or third degree, aggravated murder, or murder under the law of this state, engaging in a pattern of corrupt activity is a felony of the first degree. Notwithstanding any other provision of law, a person may be convicted of violating the provisions of this section as well as of a conspiracy to violate one or more of those provisions under section 2923.01 of the Revised Code.

*States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954). Vagueness challenges to statutes which do not involve the First Amendment must be examined in light of the particular facts of the case at hand. *United States v. Mazurie*, 419 U.S. 544, 551, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975), citing *United States v. National Dairy Products Corp.*, 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963); *Cohoon v. Rees*, 820 F.2d 784 (6th Cir.1987). Thus, "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 757, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).

Prior to the Ohio State Supreme Court's decision in *State v. Schlosser*, 79 Ohio St.3d 329, 681 N.E.2d 911 (1997), the Ohio courts were in disagreement as to the necessary mens rea to support a violation under the statute (*see State v. Rice*, 103 Ohio App.3d 388, 659 N.E.2d 826 (1995) for discussion), since O.R.C. § 2923.32, is silent as to the culpable mental state required to support a conviction, with the exception of O.R.C. § 2923.32(A)(3), which sets forth a "knowingly" mens rea element. *Id.* The Ohio Supreme Court in *State v. Schlosser, supra*, noted that the statute had been patterned after the federal RICO statute (Section 1962, Title 18, U.S.Code), which does not require any specific intent to engage in an unlawful pattern of racketeering. *State v. Schlosser, supra*, 79 Ohio St.3d at 332, 681 N.E.2d 911, citing *United States v. Scotto*, 641 F.2d·47, 55–56 (2nd Cir.1980). The Ohio Supreme Court concluded that the Ohio legislature had likewise intended strict liability under O.R.C. 2923.32(A)(1), (2) offenses. *Id.*

■■■■ Strict liability offenses do not invariably offend the Constitution. *United States v. United States Gypsum Company*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); *United States v. Dotterweich*, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943). "Failure to require mens rea, standing alone, does not violate due process." *State v. Schlosser, supra*, 79 Ohio St.3d at 332,

681 N.E.2d 911, citing *United States v. Greenbaum*, 138 F.2d 437 (3rd Cir.1943).

■■■ However, petitioner was convicted prior to the Supreme Court of Ohio's decision in *State v. Schlosser, supra*. Review of the trial court's jury instructions in this case indicate that the jury was not instructed regarding any required mens rea to support petitioner's conviction under the statute. The trial court instructed the jury as follows:

The defendant is charged in count one with engaging in a pattern of corrupt activity. Before you can find the defendant guilty of this charge you must find that the state has proven beyond a reasonable doubt that between the first day of September, 1992, and the 2nd day of January, 1996, that the defendant, while employed by or associated with an enterprise, did conduct or participate in the affairs of the enterprise through a pattern of corrupt activity.

Enterprise includes any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity. Enterprise includes illicit as well as licit enterprises. The enterprise in this case is alleged to be a group of persons associated in fact for the purpose of theft and dealing in stolen property. Corrupt activity. Corrupt activity includes engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in receiving stolen property or theft when the proceeds of any combination of these offenses exceeds five hundred dollars.

Pattern of corrupt activity means two or more incidents of corrupt activity that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event.

At least one of the incidents forming the pattern shall occur on or after January 1, 1986. The last of the incidents forming the pattern shall occur within six years after the commission of any prior incident forming the pattern.

Conduct or participate in. To conduct or participate in the affairs of the enterprise one must participate in the operation or management of the enterprise itself. An enterprise is operated not just by upper management but also by lower-run participants in the enterprise who are also under the direction of upper management. An enterprise also may be operated or managed by others associated with the enterprise who exert control over its activities.

Associated with. In order to be guilty when one is associated with an enterprise, such association must be in the nature of aiding and abetting which is defined later in the complicity part of these instructions.

In this case the incidents of corrupt activity alleged to make up the pattern of corrupt activity consist of the following:

Number One: The twelve counts of receiving stolen property for which the defendant has been indicted in counts 3, 13, 15, 16, 17, 23 and 27 of Case Number 92CR–242 and in counts 4, 5, 7, 8 and 12 of Case Number 96CR–19.

Secondly, the one count of theft for which the defendant has been indicted in count 20 of Case Number 95CR–242. You must unanimously agree on which two or more incidents make up the pattern of corrupt activity. You do not need to agree unanimously on more than two incidents to find the defendant guilty on this count.

Exhibit QQ to Return of Writ, Transcript, pp. 1436–1438. Because the state courts were in disagreement as to the mens rea required under the statute at the time of petitioner's conviction does not make the statute unconstitutionally void for vagueness. Nor was the statute unconstitutionally vague as applied to petitioner in this case. Further, petitioner has wholly failed to demonstrate that, as applied to him, the statute failed to provide fair warning of the conduct prohibited or encouraged arbitrary or discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). Petitioner's claim is without merit.

## V. CLAIM FIVE

In his fifth claim for relief, petitioner asserts that newly discovered evidence requires reversal of the petitioner's convictions. In support of his claim, petitioner argues that Anthony and Kevin Moody were promised leniency in exchange for their testimony, that the Moodys spoke during the trial in violation of the sequestration order, and that Anthony Moody testified untruthfully. Petitioner also argues that a discussion between Anthony Moody and Detective Combs shows that the police and prosecutor were aware at the time of trial that there was a leniency agreement between the police and the Moodys, although the Moodys did not testify at trial regarding any such agreement. Supplemental Petition.

 In regard to petitioner's argument that he should have been granted a new trial based upon such "newly discovered evidence," petitioner's claim fails to present a question appropriate for federal habeas corpus review. A federal court may review a state prisoner's habeas petition only on the grounds that the challenged confinement is in violation of the Constitution, laws or treaties of the United States. 28 U.S.C. § 2254(a). A federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir.), *cert. denied*, 488 U.S. 866, 109 S.Ct. 169, 102 L.Ed.2d 139 (1988). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th

Cir.1988). " '[F]ederal courts must defer to a state court's interpretation of its own rules of evidence and procedure' " in considering a habeas petition. Id. (quoting *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir.1985)). Only where the error resulted in the denial of fundamental fairness will habeas relief be granted. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988).

▬ To the extent that petitioner raises a claim of prosecutorial misconduct due to the suppression of evidence favorable to the accused, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the of the good faith or bad faith of the prosecution." *Workman v. Bell*, 178 F.3d 759, 767 (6th Cir.1998), citing *Brady v. Maryland*, 373 U.S. at 87, 83 S.Ct. 1194. Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Norris v. Schotten*, 146 F.3d 314, 334 (6th Cir.1998), citing *United States v. Phillip*, 948 F.2d 241, 249 (6th Cir.1991). No *Brady* violation occurs "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available from another source." The undisclosed evidence must have been favorable to the accused. *Elmore v. Foltz*, 768 F.2d 773, 776 (6th Cir.1985).

▬ Petitioner has attached petitioner's Exhibits C, D, E, F, G and H in support of his claim.[7] The appellate court held as follows in regard to petitioner's claim that he should have been granted a new trial:

> Appellant's claim of newly discovered evidence is based on the trial testimony of Anthony Moody and Ken Moody.

Both Moodys testified for the State at Lemaster's trial, and both testified that no promises were made in exchange for their testimony. Subsequent to the trial, both Anthony and Ken Moody filed motions for post-conviction relief on the grounds that they had been promised shock probation in their plea bargains. The trial court conducted an evidentiary hearing on the Moodys' claims and found that no promise had been made and further specifically found that Anthony Moody's

> " * * * testimony at the Lemaster trial was truthful. The court finds Moody's testimony today [at the hearing] is untruthful."

Exhibit LL to Return of Writ. Nothing in the record before this Court indicates that any evidence was withheld by the prosecution in violation of *Brady v. Maryland*, *supra*. Petitioner's claim is completely unsupported by the record before this Court. Assuming petitioner's allegations of a violation of the trial court's sequestration order as true, petitioner has failed to establish that he was deprived of a Constitutional right due to such violation. "[T]rial courts have broad discretion as to the reception or exclusion of testimony of witnesses who have violated a sequestration order." *Braswell v. Wainwright*, 330 F.Supp. 281 (S.D.Fla.1971), citing *Holder v. United States*, 150 U.S. 91, 14 S.Ct. 10, 37 L.Ed. 1010 (1893), *United States v. Ruacho–Acuna*, 440 F.2d 1199 (5th Cir. 1971). The allegations that the Moodys may have violated the sequestration order does not constitute prosecutorial misconduct. Petitioner's claim is without merit.

## VI. CLAIM SIX

▬ In his sixth claim for relief, petitioner asserts the ineffective assistance of trial counsel due to counsel's failure to conduct adequate pre-trial investigation

---

7. Exhibit C is Anthony Moody's petition for post conviction relief based in part on alleged promises of shock probation. Exhibit D is a transcript of Moody's trial testimony. Exhibit E is Kevin Moody's petition for post convic-

tion relief based in part on alleged promises of shock probation. Exhibits F, G and H are letters written from Anthony Moody to petitioner.

because trial counsel failed to call Jerry Noble, Dave Barnes or Bob Gillium as defense witnesses. In support of his claim, petitioner has attached affidavits from Noble, Barnes and Gillium (Petitioner's Exhibits J, L and K).

Noble's affidavit states that the sheriff's department pressured him in an attempt to get him to implicate petitioner:

... They were trying to harass me or intimidate me into saying something I knew nothing about and trying to get me to lie about James LeMaster. Although I have read the newspaper articles about James LeMaster, I know nothing illegal or immoral about him. They harassed me and my family continually in an effort to place criminal blame on my family and James LeMaster.... All of their questions and interrogations tried to link me and James LeMaster with stolen equipment.... No one would listen to me ... instead they continued to focus on James LeMaster and tried to place a connection with him and the stolen backhoe.

... I believe that the Sheriff and law enforcement officials wanted me to roll over on James LeMaster. I believe that if I had done this, they would have left me, my family, and business alone. This belief is based upon the officer's continued harassment and focus on James LeMaster when questioning me and my family, and their efforts to try and link him and myself with stolen equipment. I refused to lie about James LeMaster and therefore, the harassment continued. Once the Sheriff got James LeMaster where the[y] wanted him, they didn't need me anymore and the harassment ended. I believe they were just looking to get James LeMaster no matter what they had to do or who they had to harass.

Petitioner's Exhibit J. Gillium's affidavit indicates as follows:

1. That I am familiar with the criminal case involving James LeMaster.

2. That I purchased bulldozers from Kenny Moody. Although I know James

LeMaster, he had nothing to do with my purchase of this equipment from Kenny Moody.

Exhibit K to Return of Writ. Barnes' affidavit indicates as follows:

1. That I was te[l]ephoned by a man named Tony Moody at two different times, who asked me if I wanted to purchase equipment from him. That I told Tony Moody I would, and I did purchase two pieces of equipment. That I picked up the first piece at where he told me that was his property on U.S. 22 East of Circleville, and the second piece also stated to me on his property on Owl Creek Road west of Chillicothe.

2. That James LeMaster had nothing to do with my purchase of this equipment from Tony Moody. That I did not know James Lemaster at the time I spoke with Tony Moody or when I purchased the equipment.

3. That the first time I ever saw James Lemaster was in the Pickway County [J]ail and I did not even speak to him until we were both at the Correctional Receiving Center at Orient, Ohio and that was only in passing.

Exhibit L to Return of Writ.

The state appellate court made the following relevant findings regarding petitioner's claims:

... Appellant concedes that the rule in *Middletown v. Allen* (1989), 63 Ohio App.3d 443, 579 N.E.2d 254, is controlling, *i.e.* that a failure to call any witness must be a substantial violation of an essential duty of counsel and must have materially prejudiced the defense. Lemaster claims that the failure to call Robert Gillum, David Barnes, or Jerry Noble was such failure. All three filed affidavits saying that they were pressured to implicate Lemaster. All three were charged with buying property that had been stolen. None of the three had dealt with Lemaster directly, and were connected to him only through the testimony of the Moodys.

This testimony would have made the credibility of the Moodys more crucial to the State's case, but not having it presented to the jury was not substantially prejudicial. The jury had to assess the credibility of the Moodys' testimony, which implicated Lemaster. The testimony of Gillum, Barnes, and Noble does not refute the Moodys' implication of Lemaster, but taken in a light most favorable to Lemaster, merely fails to corroborate it. Whether to call or not call these witnesses was a decision for trial counsel to make, but the failure to call them does not constitute ineffective assistance of counsel.

Exhibit LL to Return of Writ.[8]

■ In order to establish the ineffective assistance of counsel, petitioner must satisfy both prongs of the test set forth in *Strickland v. Washington, supra. See* discussion *supra,* pp. 767–68. Although trial counsel has a duty to make reasonable investigations, *Wong v. Money,* 142 F.3d 313 (6th Cir.1998); *Sims v. Livesay,* 970 F.2d 1575 (6th Cir.1992); *Blackburn v. Foltz,* 828 F.2d 1177 (6th Cir.1987),

> [c]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Strickland, supra,* 466 U.S. at 690, 104 S.Ct. 2052. Scrutiny of defense counsel's performance is "highly deferential." *Id.,* at 689, 104 S.Ct. 2052.

It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance....

*Id.* "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable...." Id. at 690, 104 S.Ct. 2052.

The Court again notes the presumption of correctness accorded state court findings under 28 U.S.C. § 2254(d), (e). Upon review of the entire record, this Court again finds no reason to disturb the state courts findings here. Petitioner has failed to establish either that his attorney failed to make reasonable investigations, or that petitioner was prejudiced by counsel's failure to call Noble, Barnes or Gillum as defense witnesses. As noted by the state

---

8. The trial court made the following findings regarding petitioner's claim:

... As pointed out by the State, Gillum and Barnes were indicted for and convicted of receiving stolen property for having bought equipment stolen by this theft ring. The State never alleged that Gillum or Barnes dealt directly with Petitioner James Lemaster. The State's evidence was that Lemaster, Anthony Moody, and Ken Moody stole equipment that was later sold to David Barnes by Anthony Moody. State's evidence was also that Petitioner and Ken Moody stole equipment that was later sold to Robert Gillum by Ken Moody. The affidavits of Barnes and Gillum provided by Petitioner do not add to the or subtract from any evidence presented to the jury and are, in

fact, consistent with the State's evidence produced at trial.

The affidavit by Jerry Noble refers to pressure to cooperate with the State being placed on witnesses found in possession of stolen property. The State admits in its memorandum that it placed pressure on numerous people to testify. As correctly stated by the State of Ohio, this is true in any investigation involving an ongoing criminal conspiracy. Therefore, Petitioner's claim that failure to present this single witness [sic], in light of the many witnesses presented by defense counsel, does not rise to the level of ineffective assistance of trial counsel.

Exhibit FF to Return of Writ.

trial court, numerous witnesses were presented by defense counsel. Further, the prosecution never alleged that petitioner had dealt directly with Noble, Barnes or Gillum and admitted that pressure to cooperate and testify against petitioner had been placed on numerous individuals. Thus, the testimony of Barnes, Noble and Gillum would not necessarily have undermined the state's case. Petitioner's claim is without merit.

## VII. CLAIM EIGHT

In his eighth claim for relief, petitioner asserts that his sentence was excessive in violation of the Eighth Amendment to the United States Constitution because his sentence is greater than that given for more serious offenses under Ohio's sentencing guidelines, and because his co-defendants received lesser sentences.

The Fourth District Court of Appeals made the following findings regarding petitioner's claim:

Appellant did not receive the maximum sentence that might have been imposed for the crimes of which he was convicted. As the trial court pointed out in its decision on the motion for relief from judgment, Lemaster was the ringleader of the group and deserved the longest sentence, which is in accord with the sentencing guideline set down in R.C. 2929.12(A)(7). This court points out that R.C. 2929.11(A) says that one of the overriding purposes of sentencing is to protect the public and to deter others. Heavy equipment, as the name implies, is difficult and expensive to transport and there is a great economic benefit when owners of tractors, back hoes, and such can leave their equipment on the job site without fear of it being stolen. A heavy sentence for someone who steals this equipment, and who organizes a ring to make the thefts more efficient, is necessary to deter this kind of criminal activity. That other members of the ring received lesser sentences either because they were less involved or because they cooperated by testifying against

Lemaster does not mean that his sentence was excessive or disproportionate. Exhibit LL to Return of Writ. As noted by the state trial court, petitioner did not receive the maximum sentence possible under Ohio law, neither was petitioner's sentence disproportionately excessive under the sentencing guidelines and the facts of the case. Petitioner's claim is therefore without merit.

The Court concludes that petitioner has committed a procedural default as to his seventh claim for relief, and has failed to establish cause or prejudice for the procedural default. The Court is therefore precluded from federal habeas corpus review of claim seven. Petitioner's claims one, two, three, five, six and seven are without merit. Petitioner's request for an evidentiary hearing is DENIED (Petitioner's claim four). Based upon the foregoing, the instant petition is DENIED and this action is hereby DISMISSED.